IN THE

TENTH COURT OF APPEALS

 




 
 
 
 
 
 
 


 

 



No. 10-06-00025-CV

 

In
re Olshan Foundation Repair Company of Dallas, LLC d/b/a Olshan Foundation
Repair Company

 

 



Original Proceeding

 

 



CONCURRING  Opinion



 

I write separately to note that, even
if the FAA had been invoked, in denying Olshan’s motion to compel arbitration,
Respondent could have found that no arbitration agreement existed or that
Olshan’s foundation repair was done under a verbal agreement with Seay.  See
In re Dillard Dept. Stores, Inc., --- S.W.3d ---, ---, 2006 WL 508629, at
*1 (Tex. Mar. 3, 2006) (“In reviewing findings of fact in a mandamus
proceeding, we cannot substitute our judgment for that of the trial court.”).  Under
the FAA, courts decide whether an arbitration agreement was ever concluded, i.e.,
signed.  Buckeye Check Cashing, Inc. v. Cardegna, --- U.S. ---, --- n.1, 126 S.Ct. 1204, 1208 n.1 (2006).  While Texas law expresses a strong presumption
in favor of arbitration, the presumption arises only after the party seeking
arbitration proves the existence of an arbitration agreement.  J.M. Davidson
v. Webster, 128 S.W.3d 223, 227 (Tex. 2003).  Courts interpret arbitration
agreements under traditional state-law contract principles, which are also used
to determine the formation of such contracts when deciding whether an
arbitration agreement exists.  Id. at 227-28 (citing First Options of
Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131
L.Ed.2d 985 (1995)).

            In the trial court’s
December 15, 2005 evidentiary hearing on Olshan’s motion to compel arbitration,
the parties vigorously contested whether an arbitration agreement existed.[1] 
Olshan contended that an agreement with Scott Perrin (the prior homeowner)
dated November 19, 2001 (the “Perrin bid”) but signed only by Olshan salesman
Shannon Kemp, contains the applicable arbitration agreement.[2] 
Olshan asserted for the first time at the December 15 hearing that both its
copy and Perrin’s copy of the Perrin bid with Perrin’s signature had been lost
or destroyed.[3] 
If a written and signed document is lost or destroyed, its existence and terms
may be shown by clear and convincing evidence.  A.G. Edwards & Sons,
Inc. v. Beyer, 170 S.W.3d 684, 692-93 (Tex. App.—El Paso 2005, pet.
filed).  

But the Seays, who had agreed to
purchase Perrin’s home on November 14, 2001, contended that Perrin had nothing
to do with the foundation repair work that was actually done; Jason Seay
testified that Perrin told him that Perrin would not sign an agreement with
Olshan and that Perrin would not pay for any of the foundation repair.  Because
the house had obvious foundation problems, the Seays’ lender would not do a
mortgage without an engineer’s site plan that ensured the foundation could be
repaired.  The Seays’ engineer inspected the house on November 21 and wrote a
report with repair plans (calling for sixteen piers) dated November 26 that was
faxed to Olshan by Norma Boggs on that date.[4] 
Olshan then prepared the Perrin bid dated November 19 for sixteen piers for
$6,400 with the handwritten notation “bid per engineer report” (the engineer’s
report called for sixteen piers) and faxed it to Boggs on November 28, who in
turn faxed it to the Seays on November 29.[5] 
Under the Seays’ version of events, the Perrin bid could not have been in
existence at the time Perrin says he received it, signed it, and faxed it
(within a few days of November 19) to Olshan.  This is why, the Seays contend,
there is no available copy of the Perrin bid signed by Perrin—it never existed.[6] 
Respondent could have believed the Seays’ version of these events and thus
concluded that Olshan failed to meet its burden of proving by clear and
convincing evidence that a signed version of the Perrin bid was lost or
destroyed.[7]

Respondent could have further concluded
that Olshan’s foundation repair work was done under a verbal agreement between
Seay and Olshan’s Wegman and that the warranty was provided pursuant to that
verbal agreement, independent of any alleged agreement between Perrin and
Olshan.  See Edwards v. Schuh, 5 S.W.3d 829, 832-33 (Tex. App.—Austin
1999, no pet.) (subsequent purchasers not required to arbitrate warranty claim
against builder, where claim could be brought under express warranty contained
in builder’s letter independent from warranty in construction contract that contained
arbitration clause).  The Olshan warranty certificate itself does not refer to
any other agreement or to arbitration.

Four witnesses testified at the
hearing, and many exhibits were admitted into evidence.  Much conflicting and
contradictory evidence about the respective dealings between Perrin and Olshan
and Seay and Olshan was presented to Respondent, who resolved the disputed fact
issues against Olshan.  Cf. Dillard, --- S.W.3d at ---, 2006 WL 508629,
at *1-3 (relator must establish that trial court could reasonably have reached only
one decision; the evidence compelled a finding that employee agreed to
arbitrate).  An appellate court may
not substitute its judgment on the facts for that of the trial court.  In re
Republic Lloyds, 104 S.W.3d 354, 357 (Tex. App.—Houston [14th Dist.] 2003,
orig. proceeding); In re Rangel, 45 S.W.3d 783, 786 (Tex. App.—Waco
2001, orig. proceeding).  In other words, an appellate court may not deal with
disputed matters of fact in an original mandamus proceeding.  Republic
Lloyds, 104 S.W.3d at 357 (citing Hooks v. Fourth Court of Appeals,
808 S.W.2d 56, 60 (Tex. 1991) (orig. proceeding), and Brady v. Fourteenth
Court of Appeals, 795 S.W.2d 712, 714 (Tex. 1990) (orig. proceeding)). 
Because Respondent resolved the disputed fact issues and an appellate court cannot,
Olshan has not established its right to mandamus relief, and I would deny the
petition on this basis as well.

 

 

                                                                                    BILL
VANCE

                                                                                    Justice

 

Opinion
delivered and filed June 21, 2006.








 









[1]               See In re
Conseco Fin. Serv’g. Corp., 19 S.W.3d 562, 567-68 (Tex. App.—Waco 2000,
orig. proceeding) (if party opposing arbitration claims there is no agreement
to arbitrate, and if there are controverting facts, trial court must conduct
evidentiary hearing to determine disputed facts before deciding if there is arbitration
agreement).

 





[2]               Perrin
testified by deposition that Olshan faxed the Perrin bid to his home computer
within a couple of days of November 19, and after a day or two, he signed it
and drove to his realtor Jerry Cooley’s office and faxed it to Olshan.  Norma
Boggs, the Seays’ realtor, testified that Cooley did not have a fax machine at
his realty office.  Kemp, who is still with Olshan and who allegedly (a) negotiated
with Perrin, (b) faxed the Perrin bid to Perrin, and (c) received by fax the Perrin
bid with Perrin’s signature, did not testify.  Dawn Powers, Olshan’s office
manager, testified that she had never discussed the matter with Kemp and that her
file did not reflect sending a fax to or receiving a fax from Perrin.

 





[3]               Olshan first argued its
arbitration motion at a June 27, 2005 hearing on its motion to dismiss.  That
hearing eventually was continued because Olshan was not prepared to present
evidence, but  Olshan did not contend that Perrin had signed the Perrin bid and
that it had been lost or destroyed.

 





[4]               Boggs,
who corroborated the Seays’ version of events, said that Cooley had set up
Olshan’s November 19 inspection of the Perrin house and that she attended the
inspection with Cooley and Perrin (who did not remember Boggs’s presence). 
Kemp, the Olshan salesman, gave Boggs originals of two November 19 bid
agreements that Boggs brought to the hearing:  one bid for fourteen piers for
$5,300, and another bid for thirty-one piers for $13,950.  Boggs said that
after this initial November 19 meeting, Perrin had nothing at all to do with
the Seays’ dealings with Olshan or Olshan’s foundation repairs.

 





[5]               Contrary to the notice
in this bid that a warranty was attached, none was.

 





[6]               Even
Perrin admitted that he stopped dealing with Olshan once the Seays began
working with Olshan in late November or early December.  Jason said he dealt
with Olshan’s Paul Wegman, who asked him to sign the Perrin bid, but based on
his bankruptcy attorney’s advice (the Seays were in the middle of a
bankruptcy), Jason refused to sign it.  Seay also refused Wegman’s request for
partial payment up front.  Seay verbally agreed with Wegman to pay Olshan if it
did the foundation repair work.  Olshan started the work on February 27, 2002. 
The Seays’ engineer visited on February 28 while Olshan was working, and
because the repairs weren’t being done according to his plans, the Seays wrote
the realtors that day that the Seays would have to withdraw from buying the
house if the foundation work did not meet their engineer’s plans.  Olshan
stopped its work, but after the engineer met with Olshan, the work resumed on
March 2.  Under the engineer’s revised plans, Olshan installed six additional
piers (for a total of twenty-two piers for $8,400), and the work was completed
on March 4.  When the engineer told Seay that Olshan had completed the work,
Seay paid Olshan by having Boggs hand-deliver Seay’s $8,400 check to Olshan’s
Wegman on March 5, who signed a receipt for the check and promised a warranty
would be mailed in two weeks.  The sale of the house closed three days after
Olshan had finished.  Two weeks later, the Seays received from Perrin two
identical Olshan warranty certificates that Olshan had sent to Perrin.

 





[7]               This case is thus easily
distinguishable from In re McKinney, which did not involve a dispute
over whether a signed agreement existed.  See In re McKinney, 167 S.W.3d
833 (Tex. 2005) (orig. proceeding).








oatStyle">' );
 document.write( WPFootnote2 );
 document.write( '
Close' );
 document.write( '' );
 }

 Although this factor favors a reduction of bail, the accused’s inability
to make bail, even to the point of indigence, does not control over the other factors. 
Charlesworth, 600 S.W.2d at 317; Wright, 976 S.W.2d at 820.
      Concerning the fifth and final factor, the record reflects that the violence between McCullough
and Spigener has “escalated” from the initial reported incidents, which Spigener had declined to
prosecute. The investigator testified that at all times pertinent to her investigation of the matter
Spigener and McCullough have lived together. McCullough explained that Spigener owns a house
located on 59 1/2 acres and rents a second residence, both in Johnson County.


 She testified that
she could live on the acreage while Spigener stays in the rent house. She described the house on
the acreage as “real primitive” with no indoor plumbing. McCullough also told the court she has
been offered “another place to stay” with “a joint friend with [she] and [her] mother,” but she
refused to disclose the location of this other place besides affirming it is located within Johnson
County. Like the evidence on the first factor, the evidence regarding the future safety of Spigener
is conflicting because the violence between McCullough and Spigener has escalated, because
McCullough would not guarantee that she would completely stay away from Spigener, and because
McCullough refused to disclose the location of their “joint friend’s” home which had been offered
to her.
SUMMARY
      After considering the factors of article 17.15 and the record before us, we cannot say the trial
court abused its discretion in refusing to reduce McCullough’s bail. See Spaulding, 612 S.W.2d
at 511; Emery, 970 S.W.2d at 145. Accordingly, we overrule her sole issue and affirm the
judgment.
 
                                                                               REX D. DAVIS
                                                                               Chief Justice


Before Chief Justice Davis
            Justice Vance and
            Justice Gray
Affirmed
Opinion delivered and filed May 19, 1999
Publish